The town of Colchester *against* The town of Lyme.

The provision in the statute of 1792, regarding the emancipation of slaves, requiring a certificate from the civil authority and select-men, relates only to the future liability of the master for support, and does not impair or affect the right of the master, by his own act, to give entire freedom to his slave.

Therefore, where the master of a slave gave her a letter of emancipation, without obtaining such certificate, it was held, that such manumitted slave was capable of acquiring a new settlement by commorancy.

Where the plaintiff, in an action by one town against another, for the support of a manumitted slave, offered evidence to prove, that the former master of such slave had paid a certain sum of money for her support, shortly before she became chargeable to the plaintiff; it was held, that such evidence was irrelevant and inadmissible.

This was an action for the support of a female, named *Jenny.*

The cause was tried at *New-London,* *September* term,
1838, before *Church* J.

In 1799, and for many years before that time, *Jenny* was the slave of Dr. *Mather,* who was then a resident and settled inhabitant of *Lyme,* and continued so to be until his death in 1832. In the year first-mentioned, Dr. *Mather* set free this slave, who was then fifty-six years of age, by giving her a letter of manumission ; and he never afterwards exercised or claimed any controul over her. There was no evidence that he obtained from, or made any application for to, the civil authority and select-men of *Lyme,* a certificate authorising such manumission ; nor was there any evidence of any record thereof in the town-clerk's office. Afterwards, during the year 1799, *Jenny* went to live with Dr. *Watrous* of *Colchester,* where she remained, as a hired servant, in his family, supporting herself, until about eight years ago, when she became unable to support herself, and has, ever since, so continued. Since *May* 22d, 1834, she has been supported by the town of *Colchester.*

Upon these facts the plaintiffs claimed, that *Jenny* had never lost her settlement in *Lyme ;* and that the defendants were liable for her support. But the court charged the jury, that *Jenny,* by her residence in *Colchester,* supporting herself, had gained a settlement in that town ; and that it was their duty to return a verdict for the defendants.

The plaintiffs offered evidence to prove, that in the years 1830, 1831 and 1832, Dr. *Mather* paid *Frederick Morgan* of *Colchester,* in whose family *Jenny* had been living, for her support during that time, the sum of 150 dollars. To the admission of this evidence the defendants objected ; and the court excluded it. The defendants had a verdict ; and the plaintiffs moved for a new trial.

*Goddard* and *Child,* in support of the motion, contended, 1. That *Jenny* had no capacity to acquire a settlement, in her own right, by commorancy. The emancipation attempted by the master, was never completed according to the provisions of the statute on that subject. *Stat.* 625. *tit.* 150. *c.* 2. *s.* 1. (ed. 1808.) No certificate was given ; and none could be given, because she was more than forty-five years of age. To " emancipate," as used in this act, means the same thing as to " set at liberty," as used in another statute ; and this is to place

the subject in *a permanent condition of freedom. Colum-bia* v. *Williams,* 2 *Conn. Rep.* 467. In *Windsor* v. *Hart-ford,* 2 *Conn. Rep.* 355., a certificate had been given pursuant to the statute ; but because it had not been *recorded,* the court held, that the slave was not so emancipated as to be capable of acquiring a settlement independently of her master. While the liability of the master to support the slave remains, the incapacity of the slave to acquire a new settlement remains also. The latter is in the condition of a minor or an idiot—not *sui juris. Huntington* v. *Oxford,* 4 *Day* 189. *Salisbury* v. *Fairfield,* 1 *Root* 131. *East-Hartford* v. *Middletown,* 1 *Root* 196. A capacity to acquire a settlement is not a personal right or immunity of the individual, but is altogether a matter of statute regulation.

2. That the evidence offered by the plaintiffs, should have been received. [Not much pressed.]

*Strong* and *McCurdy,* contra, insisted, 1. That *Jenny* was completely emancipated, so that the relation of master and slave ceased, though Dr. *Mather* continued liable for her support. She could go where she pleased and do what she pleased, as fully as any other person. She was, in every respect, *sui juris. Dighton* v. *Freetown,* 4 *Mass. Rep.* 539. *Springfield* v. *Wilbraham, Id.* 493. 496. Suppose *Jenny,* after her emancipation, had purchased real estate ; would not this have given her a settlement ?

2. That the evidence offered by the plaintiffs, was irrelevant and inadmissible.

CHURCH, J. The pauper was, for many years, the slave of Dr. *Mather,* whose place of settlement was *Lyme ;* and with her master the slave had a settlement in the same town. In the year 1799, when the pauper was fifty-two years old, her master, with her consent, gave to her a letter of emancipation, and thereby set her free from her servitude ; and then, with her former master's approbation, she left his service and removed to the town of *Colchester,* where she has resided ever since, and for more than thirty years, has supported herself. If she had been a white person, or had never been a slave, it is conceded, that her residence and self-support in *Colchester* would have acquired for her a settlement there, by commoran-

New-London,
July, 1839.

Colchester
v.
Lyme.

cy.   Does the fact that she was once a slave make any differ-
ence in this respect ?

It is said, that this person could not acquire a new settlement
by commorancy, because her letter of emancipation was not
given with the approbation of the civil authority and select-
men of the town of *Lyme*, and was not accompanied by a cer-
tificate from them, as required by the statute of 1792.   That
statute provided for the gradual emancipation of slaves, while
it regulated the duties and obligations of masters.   By the sec-
ond section, as now revised, the master was made liable to sup-
port his emancipated slave ; and the third section directs the
manner of proceeding, if the master would absolve himself from
this liability.   And to do this, it was necessary for him to apply
to some of the civil authority and select-men of the town where
he resided, and procure from them a certificate that the slave
to be set free, was in good health, and was not of greater age
than forty-five years, and was desirous to be made free ; and
then, if the letter of emancipation and the aforesaid certificate
were recorded in the records of the town, the master was dis-
charged from any further charge for his support.   There was
nothing in any statute, which in the least impaired the right
of the master to give entire freedom to his slave at any time.
Such a power was necessarily incident to the relation of mas-
ter and slave ; and the want of the approbation and certificate
of the civil authority and select-men, only continued the mas-
ter's liability to support the emancipated slave, in case she
should come to want, but did not render less perfect her free-
dom, or in any way impair any of her powers or privileges.
This slave was more than forty-five years of age ; and no
certificate could by law have been granted ; and if the
plaintiffs reason correctly on this subject, she never could have
been made a free woman.   The mild and lenient system of
slavery existing in this state never sanctioned such a conse-
quence.   Slavery has existed in almost every country on the
globe, whether *Heathen*, *Jewish* or *Christian*, from periods
so remote, that its origin is, perhaps, beyond the definite re-
searches of history ; but it is not known, that any where, the
code of slavery has been so unrelenting as to deny to the mas-
ter the humane power of emancipation, subject to such political
regulations as the safety of the public and the welfare of the
slave might require.

The master of this slave, by relinquishing all claims to service and obedience, effectually emancipated her; and thus she became *sui juris,* and entitled to all the rights and privileges of other free citizens of the state, among which the right of acquiring a new place of settlement, was the most important. *Huntington* v. *Oxford,* 4 *Day* 189.

It has been urged seriously, in this case, that the capacity or power of acquiring settlements is not a personal privilege; but that the laws regulating this subject are merely intended to fix the liabilities of towns, and not to affect the rights of the citizen. We can give no countenance to this suggestion. The poor, even without their consent, may, by law, be removed to their places of settlement for support, and thus separated from relatives and friends, and other objects of affection. The power of determining for themselves where to live, and where to die, is certainly a privilege among the most valuable that can be enumerated.

The obligation of Dr. *Mather* to support this person, had no effect at all upon her capacity and privilege of acquiring for herself a new place of settlement; nor did it, in the least, impair the perfectness of her emancipation. This obligation may have been her privilege, but not her disability. Neither minor children nor married women can acquire a settlement by commorancy; but this is not, as the plaintiffs seem to believe, because their parents or husbands are under the legal obligation of providing for their support; but it is because they are not *sui juris,* but " owe duties inconsistent with the idea of self-direction and self-government." A parent and grand-parent, if of sufficient ability, are under legal obligation to support an indigent child or grand-child, though an adult; and so a child or grand-child, under similar circumstances, is bound to support a parent or grand-parent; yet this obligation was never supposed to affect the power of acquiring a settlement. *Huntington* v. *Oxford,* 4 *Day* 189.

The plaintiffs seemed also to suppose, that no other town than *Lyme* could have a remedy over against Dr. *Mather,* or his heirs, for the support of this person; and therefore, *Lyme* must be made responsible, in the first instance. This is an erroneous view of the law. The town where the emancipated slave belongs, or has a settlement, is the town empowered by statute to recover from the master, or his heirs, executors or

administrators, for expenditures incurred for the support of such slave ; and if in the present case, *Colchester* is such town, then *Colchester* only can recover of the former master or his representatives.

*New-London,*
*July, 1839.*

Colchester
*v.*
Lyme.

The plaintiffs offered evidence to prove, that Dr. *Mather* had actually paid about one hundred and fifty dollars, for the support of this pauper, after she was reduced to want, and while she resided in *Colchester*. This evidence was very properly rejected. It conduced to prove nothing in regard to the pauper's place of settlement. It only proved, that Dr. *Mather* recognized his liability, without reference to the question whether his former slave then belonged to *Colchester* or *Lyme*.

We are entirely satisfied, that this pauper had acquired a settlement by commorancy, in the town of *Colchester ;* and that no new trial ought to be granted.

In this opinion the other Judges concurred, except WAITE, J., who gave no opinion, being an inhabitant of the town of *Lyme*.

New trial not to be granted.