TOWN OF PLAINVILLE *vs.* TOWN OF MILFORD.

MALTBIE, C. J., HAINES, BANKS, AVERY and JENNINGS, Js.

Argued December 5th, 1934—decided January 21st, 1935.

*Cyril F. Gaffney*, with whom, on the brief, was *Bernard F. Gaffney,* for the appellant (plaintiff).

*Omar W. Platt,* for the appellee (defendant).

HAINES, J. The plaintiff town seeks to recover $377.35 from the defendant for the care of Harry Rose-Turner from August 19th, 1932, to June 9th, 1934, upon the allegation that he had a settlement in Milford during that period, denying its own responsibility because of the provisions of General Statutes, § 1686: "No inhabitant of any town in this State shall gain a legal settlement in any other town, unless he shall have been admitted in the manner prescribed in section 1684; or unless he shall have resided, subject to the provisions of this chapter, four years continuously in such town, and shall have maintained himself and family during the whole of said period without becoming chargeable to such town."

The uncontested portions of the finding show that Harry was the illegitimate child of Mary Rose, and that she was born in Milford December 29th, 1879. Her parents were residents and had a settlement in that town on that date and until their deaths in 1929 and 1930. She lived continuously in Milford until the early part of 1899 when she began work in New Haven, living in a boarding house there and returning frequently at week-ends to her home in Milford. After becoming twenty-one years of age, she continued to live and work in New Haven under the conditions stated until Harry was born in a hospital in Hartford, about three and one-half years, and thereafter until January 3d or 4th, 1905, when she married and went with her husband to live in Seattle, dying there January 17th, 1911.

By reason of the fact that her parents had a legal

settlement in Milford, Mary, at her birth, derived from her father the same settlement. Her father never changed his settlement, and her derivative settlement therefore remained in Milford during her minority.

At common law, the place of birth was held to be, prima facie, the place of settlement. 48 C. J. p. 450, § 41. In this State, however, it has been decided that the child takes by derivation the settlement of the father if the child is legitimate, and of the mother if it is illegitimate. Thus the place of birth may or may not be the place of settlement, depending upon the circumstances. So if the parent changes his settlement during the minority of the child, his new settlement becomes the child's settlement by derivation. *Windham* v. *Lebanon,* 51 Conn. 319; *New Haven* v. *Huntington,* 22 Conn. 25; *Bethlem* v. *Roxbury,* 20 Conn. 298; *Oxford* v. *Bethany,* 19 Conn. 229; *New Haven* v. *Newtown,* 12 Conn. 165; *Guilford* v. *Oxford,* 9 Conn. 321. Since Mary was but three and a half years past her majority when Harry was born, she had not fulfilled in any event, the statutory requirement of four years' residence to effect a change of settlement. Her settlement and, by derivation, the settlement of Harry, therefore, at his birth, was Milford.

The defendant claims that having continued to work under the conditions stated, for more than six months after the birth of Harry, Mary had acquired a settlement in New Haven, and that the settlement of Harry in 1905 was thus New Haven also. Whether this stay had the legal effect of abandoning her Milford settlement and giving her a new settlement in New Haven, depends upon the circumstances disclosed by the finding. It appears that she went to New Haven to work just before she was twenty-one years of age, and lived in a boarding house during the whole period of em-

ployment. It is also found that she went to her "home" at week-ends, frequently. The finding is not sufficiently specific to warrant a definite conclusion as to whether she acquired a settlement in New Haven or not. We pass that question as not necessary to answer, in our view of this case.

Harry was passed from one to another and finally found a home with Mrs. Turner when he was five years old. When he was seven he went with her and her husband to their new home in Plainville. She obviously became his foster mother. He took her name of Turner, though he was never legally adopted, and he lived in Plainville for fourteen years continuously until he was twenty-one years of age. The only reasonable conclusion to be drawn from these facts is that his own mother had abandoned him and she never returned. It does not appear that she ever paid any further attention to him.

Ordinarily a child is emancipated at majority. 48 C. J. p. 485, § 119, and note 34. But the desertion of a minor by his parent may also emancipate him. *Thompson* v. *Chicago, M. & St. P. Ry. Co.*, 104 Fed. 845. Emancipation occurs when a person once under the power and control of another, is rendered free. 1 Bouvier, Law Dictionary (3d Rev.) p. 1004. A minor is emancipated if placed in a new relation inconsistent with the former relation as part of his parent's family. *Tunbridge* v. *Eden*, 39 Vt. 17; *Sherburne* v. *Hartland*, 37 Vt. 528; *Wells* v. *Westhaven*, 5 Vt. 322. Where the parent has absolutely renounced, by agreement or implication, all care and control of the child, he is emancipated. *Lowell* v. *Newport*, 66 Me. 78; *Oldtown* v. *Falmouth*, 40 Me. 106, 108; *Clay* v. *Shirley*, 65 N. H. 644, 23 Atl. 531; *South Burlington* v. *Cambridge*, 77 Vt. 289, 59 Atl. 1013; 1 Schouler, Domestic Relations (6th Ed.) p. 897, § 807 *et seq.*

An unemancipated child is presumed to be still under the control of his parent, and cannot acquire a settlement in his own right. 48 C. J. p. 452, § 47; *Huntington* v. *Oxford,* 4 Day, 189. The circumstances force the conclusion that Harry was emancipated when his mother deserted him in 1905, with the result that he continued to retain the settlement which she had when she abandoned him, unless he acquired another for himself. 48 C. J. p. 453, note 25, and cases cited.

The question is then presented whether, after being emancipated while he had the settlement of his mother, he could acquire a new settlement during his minority. Our own statute, § 1686, provides for the acquisition of a settlement by any "inhabitant," and there is no disqualification as regards minors. Harry was legally an "inhabitant" during his minority. *Canton* v. *Simsbury,* 54 Conn. 86, 88, 6 Atl. 183. "It has been generally held that a minor . . . may, if emancipated, acquire a settlement in his own right under statutes providing for the acquisition of settlements by 'all persons,' 'any resident,' or 'any person,' etc., without any express disqualifications as regards minors." 48 C. J. p. 453, § 49, and decisions cited.

Although this precise question has not heretofore been decided in this State, the principle of emancipation was recognized in an early case, *Torrington* v. *Norwich,* 21 Conn. 542, 549, wherein it is said: "There is no doubt that a minor may, in certain cases, contract a relation or obligation which is inconsistent with, and will therefore supersede or suspend, his subordinate relation to his parents and thus prevent him, while such subordinate relation is so superseded or suspended, from deriving or following a settlement subsequently acquired by his parents. This would be on the ground that he was emancipated, as it is termed,

from the parents, before the acquisition of such settlement, and therefore that its derivation by the child from the parent is prevented or delayed by the destruction or suspension of the subordinate relation of the former to the latter, on which the derivation of the settlement by the child is founded." See also 48 C. J. p. 484, § 119, note 32.

The origin of our statutory provisions concerning settlement is found in an act of the General Court passed in 1667 upon complaint to the Court that "divers persons have thrust themselves into the severall Plantations of this Colony, to the unjust disturbance of the same," and the act provided a penalty to be imposed upon any person abiding in a Plantation after he had been warned to depart. 2 Colonial Records, p. 66. A further provision in 1682 was directed against the importation into a town of transients, servants or tenants, "such persons often proveing vicious and burthensome and chargeable" to the town. Security was required from the person who entertained or hired them, to protect the Plantation against being burdened or charged on their account. Provision was also made for the removal of transients to the place from whence they came unless they produced a certificate that they were persons of good behavior and free to remove to any place where they might best advantage themselves. 3 Colonial Records, p. 111. In the Revision of 1702 the preamble of the law was: "Whereas several persons of an Ungoverned Conversation, thrust themselves into our Townships, and by some under hand way, as either upon pretence of being hired Servants, or of hiring Lands or Houses, become Inhabitants in our Townships, whereby much Inconveniency doth arise to such places, such persons often proving vicious, chargeable and burthensome to the places where they come: which to prevent." Gen-

eral Statutes, Rev. 1702, p. 58. Acquisition of a settlement by commorancy seems to have first been recognized in 1792. General Statutes, Rev. 1784, and later statutes, p. 422. Throughout the development of our statutory law on acquisition of settlements, the right of the town to remove one who is not a settled inhabitant, has formed an integral part of the plan and is today found in General Statutes, § 1690.

The importance of this element is illustrated by our decisions. Thus in *Salisbury* v. *Fairfield,* 1 Root, 131, the reason why an apprentice or a ward under guardianship could not acquire a settlement, is stated to be because he was not "a subject of being warned, nor might he be parted from his guardian during his minority." In *Huntington* v. *Oxford,* 4 Day, 189, it is said (p. 196): "The words 'any inhabitant,' as used in this statute, when taken in connection with the subject-matter, and the acts contemplated to be done, cannot with propriety be considered in an unlimited sense; they must be restricted to persons *sui juris;* to persons capable of doing the acts contemplated to be done; and who, by their own authority, at their own election, may do those acts. To extend the construction so as to embrace idiots, who have no will of their own, would be absurd. To extend them to *femes coverts,* minors, apprentices, or others standing lawfully in a subordinate situation, and owing duties inconsistent with the idea of self-direction and self-government, would strike at the most important relations in society." It was held in that case, the pauper being in fact an apprentice, that "during that period, he could not with propriety be said to perform the acts of self-removal or self-support . . . and the power of the selectmen of Oxford to remove him was suspended." In *Colchester* v. *Lyme,* 13 Conn. 274, 278, it was said: "Neither minor children nor married women can ac-

quire a settlement by commorancy; but this is not, as the plaintiffs seem to believe, because their parents or husbands are under the legal obligation of providing for their support; but it is because they are not *sui juris,* but 'owe duties inconsistent with the idea of self-direction or self-government.' "

Some of the decisions are in sufficiently general language literally to include all minors, but the reasons for the rule disclosed in the authorities cited show in themselves that they cannot apply to an emancipated minor who has reached an age of discretion and judgment sufficient to enable him to choose his place of abode for himself. Such general language was used in *Harrison* v. *Gilbert,* 71 Conn. 724, 727, 43 Atl. 190, where it was said of the minor in that case: "His birth gave him a settlement in Farmington. This relation to that town he could not vary while a minor, and did not after coming of age." It appears from the record in that case that when he was fourteen years old he was bound out to a farmer until twenty-one, so that he was within the rule governing apprentices, in the cases we have cited. He was in the "subordinate relation" there referred to. Similar circumstances existed in the case of *Sterling* v. *Plainfield,* 4 Conn. 114. The language used in these decisions must be interpreted in the light of the facts before the court. The reason for the rule stated in those cases does not exist in the case of an emancipated minor of sufficient age and capacity to select his own abode.

In the instant case we have an emancipated minor who, from the age of seven years, lived for fourteen years and until he attained his majority, continuously in Plainville. The fair import of the finding is that he maintained himself without becoming a charge while he thus lived there. He was not adopted by anyone and so far as appears was not in a subordinate

relation to anyone so as to impose upon him a duty to remain where he was. Under such circumstances, he was no longer subject to have his settlement changed by any change of settlement accomplished by his mother. *Lowell* v. *Newport,* 66 Me. 78; *Tunbridge* v. *Eden,* 39 Vt. 17; *Springfield* v. *Wilbraham,* 4 Mass. 493. Certainly when he had reached sufficient maturity to exercise his own judgment in the matter of deciding where he would reside, both reason and the authorities support the conclusion that he might do so and gain a settlement by compliance with the requirements of our statute. *Lowell* v. *Newport,* 66 Me. 78; *Bucksport* v. *Rockland,* 56 Me. 22; *Monroe* v. *Jackson,* 55 Me. 55; 48 C. J. p. 453, and cases cited. We conclude that at his majority, Harry had by his own choice of domicil gained a settlement in Plainville, under the provisions of our statute.

The remaining question is whether his absences from Plainville between 1925 and the time he became dependent in 1932, were such as to change his settlement. He went to Massachusetts and New York in 1926 and was away from Plainville about one and one-half years, and then returned home. After remaining there about two years, he then went to New York to work and remained about two years, then to Middletown in this State, where he was arrested and spent about six months in various jails, and then returned to Plainville, and in August, 1932, became a town charge. He always returned from these absences to his home in Plainville and looked upon that town as his home, a fact which receives some confirmation in the finding that in 1930, in connection with the settlement of the estate of a relative, he named that town as his home. It does not appear that he ever remained away from Plainville in any one place for more than two years continuously; nor does the essen-

tial intent to abandon Plainville and establish a home elsewhere, appear anywhere in this record. On the contrary, his absences seem to have all been for the purpose of employment or pleasure.

To accomplish a change of settlement under the statute, he must have had the definite intention of abandoning Plainville. If the sole purpose of the absences was employment or pleasure, the change could not be accomplished. The intent is the controlling factor. *Newtown* v. *Southbury,* 100 Conn. 251, 253, 123 Atl. 278; *Roxbury* v. *Bridgewater,* 85 Conn. 196, 201, 82 Atl. 193. The conclusion of the trial court that this man had a settlement in Plainville at the time he became dependent, was warranted by the facts.

There is no error.

In this opinion the other judges concurred.