INHABITANTS OF TOWN OF CAMDEN
*vs.*
INHABITANTS OF TOWN OF WARREN

Knox.   Opinion, May 18, 1964

*Charles F. Dwinal,* for Plaintiff.

*Charles T. Smalley,*
*Christopher S. Roberts,*
*George C. West, Asst. Attorney General,* for Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, MARDEN, JJ.

SULLIVAN, J. All parties appearing in this case agree to all material facts and upon their request this action is reported to this court for determination. M. R. C. P., Rule 72(b).

### AGREED STATEMENT

"This question involves the pauper settlement of one Woodrow W. Carter, a minor at the time this action was commenced. The action was brought by the Town of Camden against the Town of Warren for the recovery of $396.34 expended for pauper supplies for the said Woodrow W. Carter. After the commencement of the action the State of Maine, - - - - requested to be made a party defendant in this matter. It is agreed that Woodrow W. Carter and his family did fall into distress and that the Town of Camden did furnish them necessary pauper supplies to the amount of $396.34 as alleged and that all necessary pauper notices and denials were duly sent and received.

"Lucille Carter, the mother of Woodrow Carter, was born in Bath, Maine, March 9, 1921, the illegitimate daughter of Grace Carter; Grace Carter married William F. Peters of Warren, Maine, on August 21, 1931, and took her daughter Lucille with her to Warren, Maine; Mr. Peters then had and still has a pauper residence in Warren; Grace Peters still lives in Warren, Maine, with her husband.

"Lucille Carter, the illegitimate daughter of Grace Peters, while living with her mother in Warren, had an illegitimate son, Woodrow W. Carter, who

was born in Rockland, Maine, on June 14, 1939; Lucille Carter was living in Warren with her mother and step-father and illegitimate son, Woodrow, when she became of age in 1942 and she continued to live in Warren, unmarried, until 1946, at which time she left Warren, worked for a short time in Portland, Maine, and then went to New York City where she has remained ever since; Since she left Warren she has not contributed to his support nor has she communicated with him in any way except to send him a card on his twelfth birthday.

"Woodrow Carter continued to live with his grandmother, Grace Peters, and her husband, in Warren until some time in 1956, and on March 31, 1956, at the age of sixteen, he married Judith Wiggins of Camden, Maine, and they have lived in Camden since their marriage.

"When Lucille left Warren she left her son, Woodrow, with her mother; he then being seven years of age.

"The Woodrow Carter family first requested and received pauper supplies on May 7, 1958, and the recovery requested by the Town of Camden is for supplies furnished during 1958 and 1959.

" _____ it may be further stipulated that Lucille Carter has received no pauper aid from within the State of Maine since she moved to New York in 1946."

In 1931 Grace Peters concomitantly with her marriage acquired a pauper residence in Warren. R. S., c. 94, § 1, 1. Lucille Carter, illegitimate daughter of Grace, by derivation and contemporaneously participated in such Warren settlement with her mother, R. S., c. 94, § 1, 111, until 1946 at least. R. S., c. 94, § 3.

In 1939 Woodrow W. Carter connatally derived from Lucille, his mother, a settlement at Warren. R. S., c. 94, § 1, 111. If emancipated during his minority, Woodrow W.

Carter retained his Warren settlement until after his majority in 1960, a date prior to which the pauper supplies in this controversy had been furnished to him by Camden. R. S., c. 94, § 1, VI; *Milo* v. *Kilmarnock,* 11 Me. 455, 458; *Carthage* v. *Canton,* 97 Me. 473, 476.

Our resolution of the mixed legal and factual issue of emancipation in the case at bar will not extend to consideration of the effect of emancipation upon the legal obligation of the relinquishing parent to furnish the child with necessary support not otherwise provided.

Lucille Carter was the only legally accredited parent of Woodrow Carter.

> "As the father can emancipate his child, so that he may gain a settlement in his own right, the mother, by the settlement law standing in his place, must necessarily possess the same power - - - -"
> *Dennysville* v. *Trescott,* 30 Me. 470, 473.

Unwed mothers may emancipate.

> "As to the power of minors to acquire a settlement in their own right, we are not aware of any distinction between legitimate and illegitimate - - - -"
> *Milo* v. *Kilmarnock,* 11 Me. 455, 458.
> *In re Sonnenberg* (Minn.), 99 N. W. (2nd) 444.
> *Plainville* v. *Milford* (Conn.), 177 A. 138.
>
> Compare assumptive language of *Sidney* v. *Winthrop,* 5 Me. 123, 125; *Biddeford* v. *Saco,* 7 Me. 270, 273; *Augusta* v. *Mexico,* 141 Me. 48, 49.

Emancipation:

> " - - - - is a question of law, whether or not there has been an emancipation is one of fact. In this case both questions are submitted to the court."
> *Carthage* v. *Canton,* 97 Me. 473, 476.

As for intentions:

" - - - - a mixed question of law and fact, little dependent upon mere intentions, when it is perceived, that other prevailing facts have prevented such intentions from having any important influence upon the condition of the children."
*Sanford* v. *Lebanon,* 31 Me. 124, 128.

" - - - - The language of her conduct seems to be plain and not to be misunderstood. The conduct of the pauper seems to speak a similar language, he has not followed her, or sought her aid or submitted to her control - - - - "
*Wells* v. *Kennebunk,* 8 Me. 200, 202.

Retrospection can be demonstrational:

" - - - - it is frequently of the greatest importance to ascertain the subsequent conduct of parent and child, as this may throw great light upon the intention of the parent at the time of the claimed emancipation."
*Carthage* v. *Canton, supra,* @ 476.

The relinquishment or abandonment of the child may be to a grandparent. *Wells* v. *Kennebunk,* 8 Me. 200, 202.

"Nor is it requisite that the emancipation should be express and positive. It may be inferred from the acts and conduct of the parties. But it must be proved by such facts, as indicate its existence."
*Dennysville* v. *Trescott,* 30 Me. 470, 473.

Indicants of emancipation are compiled by this court in *Thomaston* v. *Greenbush,* 106 Me. 242, 244:

"The legal effect of the father's conduct was an emancipation of the children in 1899. The general scope of that term has been variously defined by this court as 'the destruction of the parental and filial relations,' *Sanford v. Lebanon,* 31 Maine, 124, 'the voluntary acts of the parent in surrendering the rights and renouncing the duties of his

position, or, in some way conducting in relation thereto in a manner which is inconsistent with any further performance of them.' *Monroe v. Jackson,* 55 Maine, 59; 'An absolute and entire surrender, on the part of the parent, of all right to the care and custody of the child, as well as to its earnings, with a renunciation of all duties arising from such a position. It leaves the child, so far as the parent is concerned, free to act upon its own responsibility and in accordance with its own will and pleasure, with the same independence as though it were twenty-one years of age. Indeed the best test which can be applied is the separation and resulting freedom from parental and filial ties and duties, which the law ordinarily bestows at the age of majority. *Lowell v. Newport,* 66 Maine, 78."

Lucille Carter, born out of wedlock and a stepchild, at the age of 18 became an unwed mother in a community of small and quite staid population. When her child attained the age of 7 years Lucille left her mother's home and her son, never to return during the span of thirteen years important to this controversy. But for a birthday card sent by Lucille to her son 5 years after her departure this mother sent no communication, no testimonial of solicitude or of longing, no material or spiritual benefactions to her son during his formative boyhood and critical adolescence. Objectively such unnatural behavior is the antithesis of motherhood. No moral judgment will be hazarded here. Possible sensitivities, discouragements, frustrations, adversities, underprivilege, etc., are intangibles beyond the pale of our responsibility in this matter. Apart from consideration of mere intentions or of culpability,

"The language of her conduct seems to be plain and not to be misunderstood. The conduct of the pauper seems to speak a similar language."
*Wells* v. *Kennebunk, supra.*

The legal effect of this mother's conduct was an emancipation of her child and such is an irrepressible inference from the acts and conduct of the parties.

The mandate must be:

> *Judgment for the Town of Camden against the Town of Warren for the amount of $396.34, interest and costs. Judgment for the State of Maine.*