[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff St. Mary's Hospital brings this action against the defendant Karen Spring to collect for medical services rendered to Lori Morancy, the minor daughter of the defendant. The defendant defends this action on the wounds that the child to whom the plaintiff rendered services was emancipated under the common law at the time the services were rendered and thus the defendant is not obligated to pay for necessary services rendered to the child.
Lori Morancy was born on June 10, 1981. The plaintiff and Lori's father were divorced when Lori was an infant. Lori's father died in 1991. Shortly thereafter, Lori became the recipient of Social Security death benefits paid on account of her deceased father to her mother as representative payee.
In 1996, at age 15, Lori moved out of her mother's home and moved in with friends. Also in 1996, the Social Security administration notified the defendant that she had been removed as representative payee for her daughter, and Lori began receiving the Social Security checks either directly or through another representative payee. Lori returned briefly to reside with her mother in October and November 1997 for two months. Thereafter, Lori moved out again and the defendant lost contact with Lori completely until 1999. Since then, the defendant and her daughter have maintained only sporadic contact, mostly by telephone.
In May 1998, during a period when the defendant was completely in the dark about her daughters circumstances, the defendant received a call from St. Mary's Hospital indicating that Lori was there and in need of medical care, and requesting that the defendant authorize such care for her daughter who was still a minor. Over the phone, the defendant consented to allow necessary medical treatment but stated that she was not consenting to be financially responsible for any charges incurred on behalf of Lori. CT Page 11681
Between May 30, 1998, and September 19, 1998, Lori visited the emergency room at St. Mary's Hospital on ten occasions for services listed as limited or intermediate in nature. Lori was attended by staff at St. Mary's on each of those occasions and underwent medical tests and received medications and treatment as an outpatient. The plaintiff seeks to collect $4369.88 from the defendant for the services rendered during those visits.
The defendant disclaims liability on the wounds that her daughter was emancipated as a matter of common law during that period. The defendant argues that, through no fault of the defendant, the minor child left home at age 15 and supported herself thereafter. The defendant asserts that she has no financial responsibility under Conn. Gen. Stat. § 46b-37
(b)(2) for the hospital expenses of her emancipated minor daughter.
Emancipation, defined generally, is "an act by which a person who was once in the power or under the control of another is rendered free." 1 Bouvier, Law Dictionary (3d Rev.) p. 1004. A minor is considered to be emancipated if placed in a new relation inconsistent with the former relation as part of her parent's family. See Plainville v. Milford,119 Conn. 380, 384, 177 A. 138; Wood v. Wood, 135 Conn. 280, 283,63 A.2d 586 (1948). This definition reflects the archaic principle that the primary duty in the parent-child relationship was that of the child to perform services for the parent, and the view that only the actions of the parent can effect an emancipation of a child. See Kenure v. Brainerd Armstrong Co., 88 Conn. 265, 267, 91 A. 185 (1914).
Though the definition of emancipation has not changed, the view of when and how emancipation can occur has evolved in our law, due largely to modern policy considerations involving the duty of parental support. The Supreme Court has held that "[i]t would be anathema for our law to allow parents to terminate voluntarily their parental rights `solely for the purpose of evading or relieving [themselves] of responsibility to pay child support.' 3 D. Kramer, Legal Rights of Children (2d Ed. 1994) § 28.14, p. 45." In re Bruce R., 234 Conn. 194, 200, 662 A.2d 107
(1995). This reasoning applies with equal force to parental acts of emancipation. Even under the common law, a parent could not get relief from the obligation to maintain a minor child by, for example, entering into a contract with someone else to do so. Burke v. Burke, 137 Conn. 74,80, 75 A.2d 42 (1950).
But Connecticut policy also favors the emancipation of minor children in certain circumstances. Conn. Gen. Stat. § 46b-150 provides that a parent, or a minor child who has reached the age of sixteen, may seek a decree declaring the child to be emancipated. A finding of emancipation CT Page 11682 can be made upon a finding that the minor "willingly lives separate and apart from his patents or guardian, with or without the consent of the parents or guardian, and that the minor is managing his own financial affairs, regardless of the source of any lawful income. . . ." Conn. Gen. Stat. § 46b-150b (3). A decree of emancipation has the following effects, inter alia: the minor may consent to medical care "without parental consent, knowledge or liability; [and] the parents shall be relieved of all obligation to support the minor[.]" Conn. Gen. Stat. § 46b-150d (a) and (in). Indeed the Connecticut statutes on emancipation provide for a nearly complete declaration of legal adulthood if the grounds for emancipation are found to exist. These statutes do not abrogate the common law however. Conn. Gen. Stat. § 46b-150e. Rather the statutes provide for an alternative means of clarifying the legal rights of a child vis a vis the parents.
One authoritative commentator has described the difficulties in defining the legal rights and responsibilities of emancipated minors and their parents, given how the law of emancipation has evolved. What began as a narrow issue involving only the right of a parent to claim the services and earnings of a child developed into "a concept sufficiently familiar to have a status of its own."
 In subsequent cases the emancipated child was often referred to as if he had acquired the legal capacity of an adult, as if achieving emancipation were the equivalent of reaching majority. The pattern of analysis thereafter adopted by many cases was a) to determine whether the facts indicated emancipation, and then b) to hold that the minor's [legal] disabilities had been terminated. This worked well enough when the issues were confined to the child's earnings, or to his domicile, but it early became apparent that there were disabilities which did not and should not end upon emancipation. . . . [I]t is clear that the traditional method of defining emancipation and its consequences is both confused and productive of undesirable results. Emancipation as a legal term is useful, but only as a means of describing a result already reached, not as an analytical tool. (Footnotes omitted.)
Clark, The Law of Domestic Relations in the United States § 9.3, at 549-550 (2d ed. 1987).
Professor Clark goes on to argue that rather than viewing emancipation CT Page 11683 as a comprehensive concept, the more appropriate analysis is one that considers each legal disability of the child separately given the factual circumstances of the dispute.
 This analysis has the advantage of focusing the courts' attention on relevant circumstances and of avoiding broad generalizations which later have either to be ignored or distinguished away by disingenuous reasoning. Courts are beginning to adopt it in decisions which expressly hold that emancipation has occurred for some purposes but not for others.
Id.
The question for this court, then, is whether under the circumstances of this case the minor child who incurred medical expenses was an emancipated minor when those expenses were incurred, such that the parent of the minor is not liable for those costs. A determination of whether emancipation has occurred in a particular case is a question of fact.Wood v. Wood, supra, 284. Emancipation may be express or implied, the latter occurring when the parent, "without any express agreement, by [her] acts or conduct impliedly consents that [her] minor [daughter] may leave home and shift for [herself], have [her] own time, and the control of [her] earnings, and it may be inferred from and shown by the circumstances." Id. quoting Rounds Bros. v. McDaniel, 133 Ky. 669, 676,118 S.W. 956 (1908); see also, Roe v. Doe, 29 N.Y.2d 188, 324 N.Y.S.2d 71,272 N.E.2d 567 (1971).
The defendant Karen Spring has proved that the minor child voluntarily left home at age fifteen and fended for herself without the financial assistance of her surviving parent, except for a brief return to her mother's home in 1997. The minor child supported herself by living with friends and by collecting death benefits from her father's Social Security account. It is unclear whether the child worked for wages as well, although legally she could have done so. Professor Clark points to just such a fact pattern in describing the difficulty courts face in current emancipation determinations.
 In these days when we seem to be seeing the breakdown of family unity, there is a further group of cases in which the courts sometimes refer to emancipation as a basis for excusing parents from their support obligations. What makes these cases difficult is the conflict they represent between the child's need for support and the parent's traditional CT Page 11684 authority over the child's conduct. In the typical case the child leaves home against the parent's wishes, in defiance of parental authority, and then seeks to force the parent to support him. More often than not courts faced with this situation have enforced the obligation of support, no doubt influenced to some extent by the awareness that a contrary result will require the state to support the child.
Clark, The Law of Domestic Relations in the United States § 9.3, at 554 (2d ed. 1987). Although there is nothing to suggest that the minor child relied on welfare assistance or that she became a public charge in this case, it is troubling from a public policy perspective that a finding of emancipation may have the effect of leaving the plaintiff hospital effectively without recourse to seek compensation for the services it rendered to the child.
Nonetheless the court finds that the minor child was emancipated at the time the expenses were incurred in this case and that no considerations of public policy are of sufficient import to hold the defendant liable here. Even the statute under which the plaintiff seeks to hold the defendant liable provides for an exception to parental liability under the facts of this case: "[B]oth [parents] shall be liable for . . . hospital expenses rendered the . . . minor child while residing in thefamily of its parents." Conn. Gen. Stat. § 46b-37 (b)(2) [emphasis supplied].
The court finds the issues in favor of the defendant Karen Spring and against the plaintiff St. Mary's Hospital. Judgment shall enter accordingly. CT Page 11685